**Marco SAMAYOA, by his mother Estela SAMAYOA, et al., Plaintiffs-Appellants,**

v.

**CHICAGO BOARD OF EDUCATION, et al., Defendants-Appellees.**

**No. 86–1355.**

United States Court of Appeals, Seventh Circuit.

Decided Aug. 19, 1986.*

<hr>

* Oral arument on this case was held on November 8, 1985. On February 12, 1986, this court dismissed the appeal for lack of jurisdiction. As the jurisdictional problem had been resolved, on February 28, 1986, plaintiffs filed a new appeal and resubmitted their briefs from the original appeal.

Yvod D. Roustan, Chicago, Ill., for plaintiffs-appellants.

Robert J. Krajcir, Patricia J. Whitten, Law Department, Bd. of Educ. of City of Chicago, Chicago, Ill., for defendants-appellees.

Before BAUER, WOOD, Jr., and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiffs' original interlocutory appeal in this case was dismissed for lack of jurisdiction. *Samayoa v. Chicago Board of Education*, 783 F.2d 102 (7th Cir.1986). As the jurisdictional problem no longer exists, the plaintiffs now reassert their appeal from the dismissal of Count I of their complaint. We affirm.

The district court described the case as follows:

This suit alleges racial discrimination in the operation of the Walt Disney Magnet School, a Chicago public elementary school....

Count I alleges that the defendants, the Chicago Board of Education and various school officials, violated the constitutional rights of a group of Cuban, American-Indian, and white children, aged 3–4. These children were originally admitted to the Walt Disney Magnet School's prekindergarten program in June, 1981, but their admission was revoked two months later, after the school district decided to revise the racial composition of the school to reflect changes in the racial

composition of the geographic area from which the school draws pupils. (Fourth Amended Complaint, Count I, ¶ VII). Count I alleges that the defendants' actions were discriminatory because they revoked the admission of only Cubans, American-Indians and white students.

Count II is based upon the deed for the property on which the school stands. The property was granted by the federal government to the City of Chicago for the purpose of establishing a school; in the deed the city allegedly agreed to comply with Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in federally-funded programs. (Complaint, Count II, ¶ XIII). Count II alleges that the revocation of the children's admission to the school violates this contract between the federal government and the city. Paragraph XIV of Count II also alleges a series of other breaches of this contract, e.g. the lay-off of teachers and other staff, an increased student-teacher ratio, budget cuts and other changes allegedly weakening the school's educational program. The complaint alleges that these changes contribute to "white flight" by making the magnet school less attractive and therefore contravene the goals of Title VI.

Count III alleges both a due process and an equal protection violation of the rights of the children whose admissions were revoked. The complaint alleges that on October 20, 1981 the school board held a "purported hearing" regarding the revocation. This hearing did not meet minimum standards of procedural due process, however, according to the complaint. Furthermore, after the hearing the Board subsequently admitted 5 and 6-year-olds who were originally rejected with the younger plaintiffs here, but did not give a reason for treating the younger children differently.

Plaintiffs seek injunctive relief and specific performance of the deed to prevent the school board from continuing to discriminate against the plaintiff's racial and ethnic groups. Plaintiffs also seek compensatory and exemplary money damages. Although this suit originally was filed as a class action, plaintiffs in their status report now state that it is being brought only on behalf of the plaintiffs in their individual capacities.

In the original appeal this court determined that the district court's dismissal of Count I was not "directed specifically toward the denial of permanent injunctive relief," *Samayoa,* 783 F.2d at 104, and the dismissal thus could not be appealed immediately under 28 U.S.C. § 1292(a)(1). This court furthermore stated that even accepting the dismissal of Count I as "an effective denial of a permanent injunction so as to make it reviewable by interlocutory appeal," *id.,* the lack of an emergency or an urgent need to appeal while Count III still remained for trial in the district court counseled against allowing the appeal of Count I.

Consequently plaintiffs returned to the district court and asked for a dismissal of Count III. The district court dismissed Count III on May 12, 1986. The plaintiffs are here again appealing the dismissal of Count I and urging this court to reverse and remand this case for entry of a permanent injunction to prohibit the Walt Disney Magnet School from using racial quotas, entry of an order directing the immediate admission of children excluded by the racial quotas, and an award of attorney's fees.

■ We agree with the district court that the rationale of *United States v. Chicago Board of Education (Johnson III),* 567 F.Supp. 290 (N.D.Ill.1983), applies here. The plaintiffs in *Johnson* challenged as unconstitutional the desegregation plan voluntarily adopted by the Board. The desegregation plan imposed racial quotas and a ceiling on enrollments in two high schools. The plaintiffs were black children and their parents who resided in the attendance areas of the high schools. The plaintiffs asserted that the desegregation plan as applied to the two high schools violated 42 U.S.C. §§ 1981 and 1983 and 20 U.S.C. § 1703(c) by restricting minority student

admission to these schools solely on the basis of race. The district court in *Johnson* found that "[s]tripped of rhetoric, plaintiffs' contention is really that (1) each individual aspect of the [desegregation] plan and (2) every impact of every element within it must pass strict constitutional scrutiny." 567 F.Supp. at 295. The *Johnson* court agreed with the Board that "the narrow and specific relief sought by the *Johnson* and *Milton*, plaintiffs was subsumed by that provided in the *United States [v. Chicago Board of Education*, 554 F.Supp. 912 (N.D.Ill.), *aff'd*, 717 F.2d 378 (7th Cir.1983),]* action, which was brought on behalf of all the minority students in the Chicago public schools." *Id.* The district court reasoned that the "[i]mplementation of the [Consent] Decree has transformed claims of individual constitutional deprivation into claims that must be scrutinized against the [desegregation] [p]lan as an entirety." *Id.* 567 F.Supp. at 296.

Applying this reasoning the *Johnson* court concluded that the plaintiffs' challenges were collateral attacks on a desegregation plan that had already been found constitutional, and "[a]pproval of the Plan as a *whole* implicates rejection of the notion each and every element of the Plan must pass strict constitutional scrutiny in a vacuum, isolated from the other aspects of the Plan." *Id.* The court stated that the plaintiffs' efforts to inquire further into the Board's motives in instituting the Plan were unwarranted because "the actions sought to be stigmatized are part of a nondiscriminatory whole." *Id.* The *Johnson* court therefore found that the Board was entitled to judgment as a matter of law and dismissed the plaintiffs' claims.

The plaintiffs here attempt to distinguish this case from *Johnson*, but their arguments are unpersuasive. Plaintiffs point out that the *Johnson* children were given an opportunity to transfer to another school, were not accepted and then rejected, and were all black children as opposed to the white, Cuban, and American-Indian children involved here. Plaintiffs' main distinction, however, is that the *Johnson* plaintiffs attacked the desegregation plan as a whole; and the plaintiffs here maintain that they do not challenge the plan as a whole nor are they mounting a collateral attack "on any facet or part of the same."

The thrust of plaintiffs' suit is, as the issue heading in plaintiffs' reply brief indicates, that "the exclusion of the children because of their race violates the Equal Protection Clause of the Fourteenth Amendment." This was the exact argument presented in *Johnson*,[1] *see* 567 F.Supp. at 294. The district court therefore was correct in relying on *Johnson* to determine the outcome here. Moreover, as the *Johnson* court recognized, the plaintiffs' argument was adequately addressed in *United States v. Chicago Board of Education*, 554 F.Supp. 912 (N.D.Ill.1983), *aff'd*, 717 F.2d 378 (7th Cir.1983). In *United States*, the court held that "[e]ven where there is a disproportionate allocation of burdens (and it should be repeated none has been shown here), the Constitution is not offended unless the disproportion is arbitrary or invidious—unless it stems from purposes other than legitimate plan-development and plan-implementation." *Id.* at 923.

The district court found that the plaintiffs admitted that the actions complained of in Count I were done to comply with the overall desegregation plan. The district court thus concluded that "Count I challenges an individual aspect of the overall plan, and the rationale of *Johnson III* applies with equal force to this case." The plaintiffs contend, however, that they nev-

---

1. In *Johnson*, the plaintiffs described their claim in the following terms:

    [P]laintiffs' claim is based on the right to equal treatment: the Board's quotas deny black children that reside in the Gage Park and Morgan Park attendance areas the opportunity to attend a neighborhood school when

this opportunity is not similarly denied to any white child that resides in these attendance areas, or anywhere else in the city of Chicago. This, plaintiffs urge, is unconstitutional discrimination on the basis of race.

567 F.Supp. at 294.

er made such an admission and that they merely stated that the only reason given for the exclusion of the children was the change in racial quotas.

The letter that the plaintiffs received in August 1981 from the Disney school stated:

[T]he Office of Equal Educational Opportunity of the Chicago Board of Education announced racial guidelines for entering students for Walt Disney Magnet School effective September, 1981.... We are sorry to inform you that according to the above Guidelines, your child will not be entering Disney in September but instead has been placed on the *Hold List* .... We sincerely regret any inconvenience this change may cause you but Disney has now been directed to reflect the philosophy and Guidelines of Chicago's current Desegregation Plan.

■ Plaintiffs claim that the defendants used the desegregation plan "as an excuse but that cannot be the real reason" for their exclusion from the Disney school. The plaintiffs, however, do not provide any other reason for the exclusion, nor do they support their allegations that the "actions of the Board are pretextual, based on deceit and hypocrisy." Plaintiffs urge this court to require the Board to explain why the guidelines and philosophy of the desegregation plan compel racial quotas and the exclusion of the plaintiffs. The Board, however, need not do that as the use of racial quotas and assignment schedules for students has already been approved in *United States v. Chicago Board of Education.*

■ The plaintiffs also argue that even if *Johnson* does apply to this case, the decision in *Johnson* was incorrect. The plaintiffs agree with the *Johnson* court that "[a]pproval of the [desegregation] [p]lan as a *whole* implicates rejection of the notion each and every element of the Plan must pass strict constitutional scrutiny in a vacuum," 567 F.Supp. at 296. But plaintiffs disagree that "[i]mplementation of the [Consent] Decree has transformed claims of individual constitutional deprivation into

claims that must be scrutinized against the Plan as an entirety." *Id.* The plaintiffs contend that this statement is "not true in all situations, and certainly it is not true when there is an invidious discrimination as in Disney." The plaintiffs then discourse upon utilitarianism and the relationship between the individual and the whole community, concluding, among other things, that "[t]he Desegregation Plan as a whole cannot ignore the welfare and the constitutional rights of the concrete individuals." Plaintiffs' concerns have been amply addressed in the *United States* litigation, *see* 554 F.Supp. at 922–26.

As this discussion illustrates, the plaintiffs are indeed necessarily attacking the desegregation plan as a whole by challenging its effect upon them. We agree with the *Johnson* court's assessment of this argument:

So viewed, plaintiffs' contentions do become collateral attacks on a Plan that has passed constitutional muster. This Court has found the burdens of the Plan (in terms of students in attendance outside their neighborhood schools) impact in a way strikingly proportional to the racial makeup of the school population as a whole, [*United States v. Chicago Board of Education,*] 554 F.Supp. at 992–23. Any such outcome must perforce be the result of heavier impact in some places and lighter impact in others—else every component of the system would have to replicate in microcosm what the entire system reflects in macrocosm. And *that* the Constitution has never mandated, see *id.* at 923–24. For that reason plaintiffs' efforts to compel further factual probing into Board's motives are bootless, for the actions sought to be stigmatized are part of a nondiscriminatory whole.

*Johnson III,* 567 F.Supp. at 296.

■ Plaintiffs also assert that the defendants have not even complied with the desegregation plan on which they rely. Plaintiffs point to section 2.2 of the "Student Assignment Principles" which provides:

The Board will implement magnet schools.... Magnet schools shall contain racial/ethnic goals ... to ensure that their racial/ethnic composition achieves integration/desegregation at a level 15%–35% white (65%–86% minority) by September 1982, with respect to entering grades, and with respect to other grades to the extend [sic] the goal can be achieved *without excluding students presently enrolled.*

Part II, Student Desegregation Plan for the Chicago Public Schools, pp. 5–6 (emphasis added). The defendants, however, did not violate section 2.2 by excluding the plaintiffs because the plaintiffs were not "presently enrolled" in Disney. The plaintiffs had been accepted for enrollment but had not actually been enrolled in the school when the racial quotas were changed.

For the reasons stated above, the district court's dismissal of Count I is

**AFFIRMED.**