**Marco SAMAYOA, By his mother Estela SAMAYOA, et al., Plaintiffs-Appellants,**

v.

**CHICAGO BOARD OF EDUCATION, et al., Defendants-Appellees.**

No. 86–1355.

United States Court of Appeals, Seventh Circuit.

Dec. 10, 1986.

Yvon D. Roustan, Chicago, Ill., for plaintiffs-appellants.

Patricia J. Whitten, Law Dept. Bd. of Ed., City of Chicago, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE and MANION, Circuit Judges.

### ORDER

On consideration of the petition for rehearing and suggestion for rehearing *in banc* filed in the above-entitled cause by plaintiffs-appellants on September 2, 1986, a vote of the active members of the Court was requested, and a majority of the active members of the Court have voted to deny a rehearing *in banc*.[1] All of the judges on the original panel have voted to deny the petition for rehearing. Accordingly,

IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.

EASTERBROOK, Circuit Judge, with whom POSNER, Circuit Judge, joins, and COFFEY, Circuit Judge, joins with respect to Parts II and III, dissenting.

Marco Samayoa and other children were admitted to the Walt Disney Magnet School, a public elementary school in Chicago. The consent decree now governing Chicago's public schools calls for annual revisions of the quotas at each school as the city's racial makeup changes. The number of white students in Chicago continues to fall. The revision effective in the fall of 1981 reduced the quota in force at Disney School and compelled the exclusion of the plaintiffs—American Indians, Cubans, and others of various lineages.

The panel held, 798 F.2d 1046, that the plaintiffs have not stated a constitutional claim. It relied principally on *United States v. Board of Education*, 567 F.Supp. 290 (N.D.Ill.1983) (*Johnson III*), which rejected a claim made by black students excluded from schools in Chicago in order to make room for white students. The district court observed in *Johnson III* that every remedy for segregation entails the drawing of racial lines and that every line will affect some people more than it affects others. 567 F.Supp. at 295. Everyone has a racial identity, so if a line could be attacked on the ground that it injured a given person or race, the school board would be unable to consider race in assigning students to schools. The district court concluded that the way around this difficulty is to require any person objecting to the use of race to attack the plan as a whole. *Id.* at 295–96. No one may attack any particular line, the court held. The plan as a whole had been upheld by an earlier opinion of the district court, so *Johnson III* concluded that the plaintiffs could not obtain relief. The panel endorsed *Johnson III*, see 798 F.2d at 1049–50. The analysis of *Johnson III* is problematic, however, enough so that our court should review the matter independently.

### I

The position taken by the panel—that people adversely affected by a consent decree cannot attack the decree without showing that *every* feature of the decree is unconstitutional—collides with *Firefighters Local 93 v. City of Cleveland*, —— U.S. ——, 106 S.Ct. 3063, 3073–80, 92 L.Ed.2d 405 (1986), which was decided after *Johnson III* and which the panel did not cite. *Firefighters* holds that for most purposes a consent decree is a contract. See also *United States v. Western Electric Co.*, 797 F.2d 1082, 1089 (D.C.Cir.1986). Parties to litigation may not sign contracts, with or without the court's approval, that

---

1. Judges Posner, Coffey, Easterbrook, and Manion voted to grant rehearing *in banc*. Judge Posner joins in Judge Easterbrook's dissent to the Order of this court denying rehearing *in banc*, and Judge Coffey joins parts two and three of Judge Easterbrook's dissent. Judge Easterbrook's dissent follows this Order.

stipulate away the rights of strangers. *Secretary of Labor v. Fitzsimmons*, 805 F.2d 682, 695–97 (7th Cir.1986) (en banc). A person is bound by a judicial decree only to the extent he had notice and an opportunity to participate fully. Consent decrees therefore are open to challenge by strangers. See *United States v. Jefferson County*, 720 F.2d 1511, 1517–18 (11th Cir.1983); *Ashley v. City of Jackson*, 464 U.S. 900, 901–02, 104 S.Ct. 255, 256–57, 78 L.Ed.2d 241 (1983) (Rehnquist & Brennan, JJ., dissenting from the denial of certiorari). See also *United States v. City of Miami*, 664 F.2d 435 (5th Cir.1981) (en banc); *EEOC v. Safeway Stores*, 714 F.2d 567 (5th Cir. 1983). So far as strangers to the litigation are concerned, consent decrees are programs voluntarily adopted by the parties. The provisions of the decree may be challenged to the same extent these voluntary programs may be challenged. See *Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). We must treat the quota affecting Disney School as a program voluntarily adopted by Chicago's Board of Education, which it is.

If the Board had adopted a resolution imposing a racial quota on Disney School, students excluded from the school could have challenged their exclusion without showing that the Board's entire attendance policy is unconstitutional. A litigant is entitled to challenge governmental acts that apply to him, for the Constitution requires the Board to treat him as a *person,* and not merely as a member of a group identified by race. The plaintiffs are not pieces to be moved around in a board game, with no redress unless they can show that all of the rules of the game are stacked. A person aggrieved by one discriminatory clause in a statute need not show that every clause is unconstitutional. The Supreme Court has held that sections of statutes must be evaluated individually. E.g., *Papasan v. Allain*, —— U.S. ——, 106 S.Ct. 2932, 2945–47 & n. 17, 92 L.Ed.2d 209 (1986), rejecting an argument that discriminatory implementation of one statutory provision may be made up for by countervailing effects elsewhere. The Court has rejected "bottom line" defenses in the law of discrimination. *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (Title VII of the Civil Rights Act of 1964). The existence of a device that affects people adversely according to their race may not be justified by some other device that benefits other people of the same race. Neither the decree nor the existence of countervailing clauses allows a court to decline to adjudicate a challenge to a particular provision that affects third parties. Yet that is what the panel did. It accepted a "bottom line" defense without differentiating the rights of the plaintiffs from the interests of racial groups.

The panel did not explain why the plaintiffs must attack the whole decree in order to be heard on their own claims. One potential reason could be that consent decrees bind strangers to the litigation in a way that a plan unilaterally promulgated by the School Board does not, but that reason would be inconsistent with *Firefighters.* Another reason could be that there is something special about attendance plans for school districts, whether or not embodied in consent decrees, so that plaintiffs must challenge the whole plan. This reason would be inconsistent with the rule forbidding a litigant to raise the rights of others. A doctrine that makes *jus tertii* claims essential to constitutional litigation has little to recommend it and Article III of the Constitution to condemn it.

## II

The district court in *Johnson III* relied on its earlier holding that the consent decree as a whole is constitutionally appropriate. The panel's reliance on *Johnson III* suggests that it, too, blessed the consent decree. Yet the panel did not address the constitutionality of the decree or any of its provisions, and this court has never done so before. The panel said (798 F.2d at 1049) that "the plaintiffs' argument was adequately addressed in *United States v. Chicago Board of Education*, 554 F.Supp. 912 (N.D.Ill.1983), *aff'd*, 717 F.2d 378 (7th Cir.

1983)." But our opinion at 717 F.2d 378 was concerned only with the district court's order to the United States to provide additional funds to the Chicago Board of Education. We have never passed on the adequacy of this plan as a whole, on its application to Disney School in particular, or on the feature of the plan that gave rise to this case—the alteration in the quota every year to reflect changes in Chicago's population.

We have come close twice. Before the entry of the consent decree, we held in *Johnson I* and *Johnson II* that Chicago's voluntary quotas were constitutional. *Johnson I* was vacated with directions to consider mootness. *Johnson v. Board of Education*, 604 F.2d 504 (7th Cir.1979), *vacated*, 449 U.S. 915, 101 S.Ct. 339, 66 L.Ed.2d 162 (1980). After remand we reaffirmed the propriety of the quotas on the basis of *Johnson I*, see *Johnson v. Board of Education*, 664 F.2d 1069 (7th Cir.1981), and the Supreme Court vacated the decision again, this time with an opinion, 457 U.S. 52, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982). The Court thought the consent decree required a reassessment of the situation. It reminded us (*id.* at 53–54, 102 S.Ct. at 2224–25): "Because we have vacated the Court of Appeals' judgments in this case, the doctrine of the law of the case does not constrain either the District Court or, should an appeal subsequently be taken, the Court of Appeals." The Supreme Court expected our court to turn once more to the merits of racial quotas in Chicago's schools. But we have not done so. *Johnson III* was not appealed, and the panel in this case did not examine the question anew.

### III

The merits of a case such as this are difficult to assess. Chicago has not been found to have engaged in racial discrimination in operating its schools. It has not confessed to such discrimination. We have not held that a quota system is an appropriate remedy for any misconduct that may have occurred in Chicago. Some such find-ing, based on a likelihood of a violation, is essential before children may be shuffled from one school to another on account of their race.

*McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971), establishes that a school district may take race into account in devising its own remedy for discrimination in the operation of its schools. It need not wait for a judicial order. But *McDaniel* grew out of a former dual school system. Chicago was not a dual system. A plan that entails extensive use of race by public officials therefore requires strong justification. See *Wygant v. Jackson Board of Education*, —— U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Just how strong is a matter of dispute. The many opinions in *Wygant* show that the greater the private injury from the government's use of race as a ground of decision, the stronger the justification the government must supply. We must assume that plaintiffs' injury is substantial. Disney School, as a "magnet" school, is supposed to "attract" students by virtue of superior offerings. It is one of the few public schools in Chicago with a pre-kindergarten program. Doling out opportunities to attend such schools on account of one's membership in a racial group requires justification. Five Justices in *Bakke* concluded that the use of race to decide who should receive a medical education requires powerful justification. 438 U.S. at 287–91, 98 S.Ct. at 2746–49 (Powell, J., joined by White, J.), 355–62, 98 S.Ct. 2781–85 (Brennan, White, Marshall & Blackmun, JJ.). See also *Wygant*, 106 S.Ct. at 1846–47 (Powell, J., joined by Burger, Rehnquist & O'Connor, JJ.), 1852–53 (O'Connor, J.). And see *Fullilove v. Klutznick*, 448 U.S. 448, 548, 100 S.Ct. 2758, 2810, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting).

Disney School is not a medical school, but it is not fungible with other schools. We cannot say, at least not without evidence, that people who cannot attend Dis-

ney School will receive an equivalent education at another of Chicago's public schools. (This is also a reason why the plaintiffs did not need to attack the consent decree as a whole. The use of racial criteria to assign students so as to eliminate the racial identity of otherwise-identical schools may be justified even though the use of racial criteria to determine who shall attend an enriched school is not.) A strong justification is required before Chicago may turn people away from this school on the ground that "we already have enough of your kind"—which is roughly what Chicago told these plaintiffs, many of whose "kinds" have heard these words before.

The Chicago officials did not offer such justification here—at least the panel did not discuss any, and Chicago does not offer one in its reply to the petition for rehearing. The dominant theme in both the panel's opinion and the Board of Education's response is: "This has all been decided." But it has not been decided, and the necessary justification has neither been offered by the Board nor been found sufficient by this court. Chicago's use of racial criteria to decide who shall receive the benefits of a superior school has not received from any court the "strict and searching" examination that is necessary. *Bakke*, 438 U.S. at 362, 98 S.Ct. at 2784 (opinion of Brennan, White, Marshall & Blackmun, JJ.). See also *Sheet Metal Workers Local 28 v. EEOC*, —— U.S. ——, 106 S.Ct. 3019, 3036–37, 92 L.Ed.2d 344 (1986) (discussing use of racial preferences to "remedy past discrimination" and suggesting that the rationale for such preferences also limits their scope).

There is a further problem. The desegregation plan calls not only for an initial quota to eliminate any racial identity in the schools but also for annual adjustments to keep each school's racial mix in line with that of the whole school district. This sort of plan is similar to the one in *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). *Spangler* held that the Constitu-

tion does not require annual readjustments to keep each school in line with a changing population. *Id.* at 434–38, 96 S.Ct. at 2703–06. This case does not involve a plan imposed on Chicago by a court, but *Spangler* is relevant because both the parties and the panel have proceeded as if the consent decree were a remedy for an established wrong. The annual readjustment cannot be justified as a remedy. *Firefighters* holds that consent decrees may include remedies that courts could not impose on unwilling defendants, but it also observed that the concomitant of the parties' ability to go beyond what is required is exposure to the complaints of those injured by the excess. 106 S.Ct. at 3077–78. The excess here raises problems of its own.

The constitutional obligation of public officials is to assign students without regard to race. When they violate that obligation, and when the schools become racially identifiable as a result, a court may require them to take race into account yet again to undo the racial identities. E.g., *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Columbus Board of Education v. Penick*, 443 U.S. 449, 465–67, 99 S.Ct. 2941, 2950–52, 61 L.Ed.2d 666 (1979). This remedy overcomes today's effects of yesterday's wrong. *Spangler* holds that there is no further obligation to keep each school's racial mix in line with that of the school system as time goes by. See also *Swann*, 402 U.S. at 22–25, 91 S.Ct. at 1279–81. Once the racial identity of the school has been eliminated, the wrong has been dealt with. The remedy extends no further than the effects of the violation. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977). No one has suggested that Disney School is now or ever has been racially identifiable as a result of discrimination by the School Board. The school district therefore is free under the Constitution, so far as the proof in this litigation demonstrates, to use a race-neutral system of assignment, at least at Dis-

ney. *Riddick v. Norfolk School Board,* 784 F.2d 521 (4th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986) (applying this principle to an entire school system).

Continued use of race in assigning students, when under *Spangler* the school district is free to act in a race-neutral fashion, raises new problems, and it is potentially a new wrong. It certainly requires a new justification. There is a substantial argument that the provision of this consent decree calling for a continual updating of racial quotas is a new constitutional wrong. Whether the decree compels or just allows Chicago's officials to use racial criteria even after the lingering effects of earlier wrongs (if any) have been extirpated should not matter.

This court has never passed on the crux of the objection to the provision in the consent decree that caused the plaintiffs to be excluded from Disney School. The provision is open to serious question. The use of race by the government to grant or withhold benefits is too important to be passed by in silence. Race has been the Nation's most divisive problem. The treatment of people as representatives of groups defined by race, rather than as individuals, is presumptively improper. One lesson now being taught in the public schools of Chicago is that race is more important than talent or dedication or learning potential in deciding who shall receive a superior education. This lesson is regrettable. Perhaps it is a necessary story, to be told for a short and transitional period. But no court has found that the City of Chicago must teach its youngsters the importance of race or that it has any justification for doing so. Any person turned away by the government on account of his race is entitled to a respectful hearing by a court, a hearing at which the government must supply a powerful justification. Chicago has not offered a justification, and the plaintiffs in this case have not received their due from this court.