In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3980

BRUCE AND SHARON BILLINGS,
the parents of a minor child, B.B.,

Plaintiffs-Appellants,

v.

MADISON METROPOLITAN SCHOOL DISTRICT,
JOHN BURMASTER, NANCY ZABEL, LAURA
MUELLER, SUE PERRY, ANNIE KEITH, ROBERT
WEISNER, SUE BERTHOUEX, AND SHELLY COSGROVE,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 95---John C. Shabaz, Judge.

ARGUED MAY 7, 2001--DECIDED August 2, 2001


   Before FLAUM, Chief Judge, and RIPPLE and
DIANE P. WOOD, Circuit Judges.

   RIPPLE, Circuit Judge.   Bruce and Sharon
Billings brought this action pursuant to
42 U.S.C. sec. 1983 against the Madison
Metropolitan School District ("school
district") and certain employees at John
Muir Elementary School: Principal John
Burmaster and teachers Nancy Zabel, Laura
Mueller, Sue Perry, Annie Keith, Robert
Weisner, Sue Berthouex, and Shelly
Cosgrove. On behalf of their minor child,
B.B., the Billings alleged a violation of
the Equal Protection Clause of the
Constitution of the United States and a
violation of the Wisconsin Constitution.
The district court granted summary
judgment for the defendants. The Billings
now appeal. For the reasons set forth in
the following opinion, we affirm in part
and reverse in part the judgment of the
district court.

I
BACKGROUND

A.  Facts

   The Billings' daughter, B.B., was a
student at John Muir Elementary School in

Madison, Wisconsin, from kindergarten until the middle of her third-grade year. The Billings claim that B.B. was denied equal protection of the law because she was placed in Ms. Zabel's third-grade class based on her race. They also claim that, B.B., while in Ms. Zabel's class, was subjected to disparate treatment because of her race.

1.  Placement

   In the spring of 1999, second-grade teachers at John Muir met three or four times to discuss class assignments. The school district had no policy or practice regarding the assignment of students to elementary school classes. The only instructions to the teachers regarding student placement came in a memo from Principal Burmaster on May 4, 1999:

As we discussed at our staff meeting, the basic outline for deciding and balancing class lists will remain the same as in years past: to the extent possible we should attempt to balance classes according to gender, ethnicity, academic abilities, and special needs while also considering the Parent Input sheet which should have been returned to you. Please consult with Special Ed teachers if you have concerns or questions about programming needs of EEN students. You should have gotten a copy of the "Student Inventory" card that Kristen mentioned in your mailbox. I hope that it makes your job easier. I will try to get to as many of your placement meetings as possible. Thank you for your devotion to this difficult and important task.

Burmaster Aff. para. 8, Ex.E.

   Sue Perry, Annie Keith, and Sue Berthouex were involved in assigning second-grade students to third-grade classes in the spring of 1999. The teachers prepared an index card for each of their students. The index card contained biographical data including academic abilities, behavioral issues, special education needs (if any), ethnicity, neighborhood, gender, reading level, and math level. The teachers then used the information on the index cards in an attempt to assign the children so the classes reflected the overall biographical makeup of the third grade at John Muir. Academic criteria were used to

distribute high and low achieving students evenly throughout the third-grade classes. To fairly distribute the workload among teachers, the special education status of a child also was considered to ensure a roughly equal distribution of special education students in each class. The ethnicity of the students only was considered as a general guideline to ensure that none of the classrooms contained a disproportionate number of minority students. The neighborhood where the child resided only was considered to avoid isolating a child from studentsliving in his or her particular neighborhood.

Although Ms. Perry and Ms. Cosgrove jointly taught B.B.'s second-grade class, Ms. Cosgrove did not attend the class assignment meetings. Consequently, it was Ms. Perry who recommended that B.B. be assigned to Ms. Zabel's third-grade class. In making her decision, she reviewed the composition of two other third-grade classrooms, those taught by Mary Bostrom and Lesley Wilke-Nadler. Ms. Perry selected Ms. Zabel's class for two reasons: (1) the Billings had expressed a desire for B.B. to be with a teacher who had high expectations, and Ms. Perry believed Ms. Zabel would meet those needs; (2) B.B. had had some negative incidents with special education students assigned to Ms. Bostrom's and Ms. Wilke-Nadler's classrooms. Additionally, Ms. Zabel's class was comprised of students with a broad range of academic aptitudes from low to above-average.

2. Treatment

Early in the 1999-2000 school year, Ms. Zabel divided her class into two groups of six and three groups of four. She explained that "in a group of four I would put two African-Americans together." Zabel Dep., Vol.II, at 33. When asked why she seated African-American students in pairs, Ms. Zabel stated, "I think in my education training sometimes we were told that African-American students need a buddy, and sometimes it works well if they have someone else working with them because they view things in a global manner." Id. Deana Marie Zentner, a student teacher in Ms. Zabel's class in the beginning of the 1999-2000 school year, corroborated this testimony. When asked about the classroom

seating arrangement, Zentner stated that Ms. Zabel "tried to have two African-American students at each cluster and also did the same with the Hispanic students." Zentner Dep. at 70-71.

## B.   District Court Proceedings

The Billings were unable to resolve these issues with the defendants. Consequently, the Billings brought this action in district court. In their complaint, they alleged that both B.B.'s assignment to Ms. Zabel's class and her treatment while in that class violated the Equal Protection Clause. The defendants moved for summary judgment, which the district court granted. The district court first concluded that, although race was considered as a factor in the overall class assignment process, there was no evidence that B.B. was placed in Ms. Zabel's class because of her race. As a result, the district court held that the decision to place B.B. in Ms. Zabel's class did not deny B.B. equal protection of the law. Furthermore, the court stated that there was no evidence whatsoever to suggest that B.B. was placed in Ms. Zabel's class to serve as a role model for low-income African-American students, as the Billings had alleged.

The district court also dismissed the Billings' disparate treatment claim that alleged that Ms. Zabel treated B.B. differently in the classroom because she was an African-American. Despite Ms. Zabel's own admission in her deposition that she sat African-American students in pairs because she believed they needed a buddy, the district court found that there was no evidence that B.B. was treated differently from children of other races. Additionally, the district court held that even if Ms. Zabel seated African-American children together in her classroom, such a seating arrangement, without more, was insufficient to support a claim that B.B. was denied equal access to educational opportunities. The Billings now appeal.

## II

## DISCUSSION

## A.   Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This court reviews the district court's grant ofsummary judgment de novo. See Cliff v. Bd. of Sch. Comm'rs, 42 F.3d 403, 408 (7th Cir. 1994). To survive a motion for summary judgment, the Billings must make a showing sufficient to establish each essential element of their cause of action for which they will bear the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Draghi v. County of Cook, 184 F.3d 689, 691 (7th Cir. 1999). In other words, if the Billings do not produce evidence sufficient to sustain a jury verdict in their favor, we shall affirm the district court's grant of the defendants' motion for summary judgment.

B.  Prima Facie Case for an Equal Protection Violation

The Billings allege, on behalf of their minor daughter, B.B., a violation of the Equal Protection Clause of the Fourteenth Amendment. A plaintiff asserting an equal protection violation must establish that a state actor has treated him differently from persons of a different race and that the state actor did so purposefully. See Washington v. Davis, 426 U.S. 229, 239-42 (1976); DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000). The Billings allege that the defendants violated the Equal Protection Clause in two separate ways. We shall now address each of these claims.

1.  Class Placement

The Billings claim that B.B.'s third-grade classroom assignment for the 1999-2000 school year was based on race. The district court held that the Billings did not meet their burden of showing that Ms. Perry assigned B.B. to Ms. Zabel's class based on B.B.'s race. In our view, the record supports the district court's holding. Evidence in the record shows that Ms. Perry made her decision based on two race-neutral reasons: (1) B.B.'s parents had expressed their desire for B.B. to be with a teacher who had high expectations, and Ms. Perry believed Ms. Zabel would meet those needs; (2) Ms.

Perry did not select the two remaining classrooms because B.B. had experienced problems with special education students placed in each of those classrooms.

These race-neutral reasons will not support an equal protection violation. A plaintiff asserting an equal protection violation must establish that a state actor purposefully treated him differently because of his race. See Coalition to Save Our Children v. State Bd. of Educ., 90 F.3d 752, 763 (3d Cir. 1996) (holding that, although a disproportionate number of African-American students were placed in special education, there was no equal protection violation because the record revealed that placement was accomplished solely through the use of race-neutral criteria). Indeed, the Billings even have failed to show that there was a disproportionate number of African-American students in the class to which B.B. was assigned. Ms. Zabel's class had slightly more African-American students-- one more than Ms. Bostrom's, two more than Mr. Weisner's, and three more than Ms. Wilke-Nadler's--but overall Ms. Zabel's, Mr. Weisner's, and Ms. Wilke-Nadler's classrooms each had a total of twelve minority students.

In a further effort to show that B.B. was placed in Ms. Zabel's class because of her race, the Billings maintain that B.B. was assigned to that section to serve as a role model for other African-American students. The Billings rely heavily on the Supreme Court's decision in Wygant v. Jackson Board of Education, 476 U.S. 267 (1986) (plurality opinion), to support their claim that such a motivation for classroom placement violated B.B.'s equal protection rights.

The record shows that B.B. was the only African-American student in the class who did not live in Wexford Ridge, a neighborhood within the school district where a number of African-American students lived. She was also the only African-American student without a low aptitude in reading and math. Nonetheless, the district court determined that, without question, B.B. was not assigned to Ms. Zabel's class to be a role model. We agree. The Billings provide no evidence that Ms. Perry ever considered that B.B. could be a role

model for other African-American students or assigned her to Ms. Zabel's class for that reason. On the contrary, as we already have noted, the record makes clear that Ms. Perry had race-neutral reasons for making the placement.

The Billings only became concerned about B.B.'s possible status as a role model after a telephone conversation between Principal Burmaster and Mrs. Billings. During this conversation, which focused primarily on a disciplinary incident in Ms. Zabel's class, Principal Burmaster mentioned that he hoped B.B. could be a role model for "these other children." Sharon Billings Dep. at 111. Principal Burmaster's remark is ambiguous as to the children for whom he hoped that B.B. could be a role model; the Billings have provided no evidence justifying their assumption that the principal was referring only to African-American students. Additionally, the principal's offhand remark is irrelevant to our review of the assignment process because it is undisputed that Principal Burmaster did not participate in making the classroom assignments.

The Billings have failed to establish a prima facie case for an equal protection violation on their claim that B.B. was assigned to Ms. Zabel's class on the basis of race. The district court correctly determined that summary judgment ought to be granted to the defendants on this claim.

2.  Equal Education Opportunities

The Billings also claim that B.B. was denied educational opportunities equal to those of white students. They make two allegations in this regard. First, the Billings claim that Ms. Zabel did not give B.B. individualized instruction in a manner comparable to the assistance she gave to white students with similar academic capabilities. The Billings have provided no evidence that Ms. Zabel gave white students more challenging assignments than B.B. Therefore, because this argument is devoid of supporting evidence in the record, it warrants no further discussion.

The Billings' second claim of denial of equal educational opportunities requires significantly more analysis. They

maintain that Ms. Zabel treated B.B. differently because of her race in the classroom seating arrangement: that Ms. Zabel required that African-American and Hispanic students sit in pairs in class. Although Ms. Zabel's deposition testimony is not without ambiguity, this claim appears supported by both that testimony as well as her student teacher's testimony. Not only did Ms. Zabel admit that, at an early period in the school year, she arranged for minority students to sit in pairs in her classroom, but she stated that she did so purposefully. Ms. Zabel explained that she utilized the race-conscious seating arrangement because she believed that African-American students "need" a partner because "they view things in a global manner." Zabel Dep., Vol.II, at 33.

"Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 291 (1978) (opinion of Powell, J.). Specifically, in the school context, the "constitutional obligation of public officials is to assign students without regard to race." Samayoa v. Chicago Bd. of Educ., 807 F.2d 643, 647 (7th Cir. 1986). Ever since the Supreme Court's landmark decision in Brown v. Board of Education, 347 U.S. 483 (1954), it has been established beyond question that state-imposed racial classifications in the educational environment can have a significant effect on the capacity of the involved children to profit from their education. In Brown, a unanimous Supreme Court pointedly stated that to separate children "from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." Id. at 494. The Court emphasized that such discriminatory treatment is of particular concern when it affects "children in grade and high schools." Id. Again in Milliken v. Bradley, 433 U.S. 267, 287 (1977), the Court wrote:

Children who have been thus educationally and culturally set apart from the larger community will inevitably acquire habits of speech, conduct, and attitudes reflecting their cultural isolation. They

are likely to acquire speech habits, for example, which vary from the environment in which they must ultimately function and compete, if they are to enter and be a part of that community.

The racial classification that occurred in Ms. Zabel's class was not the sort of total racial segregation at issue in Brown or in Milliken. It was also of short duration. Yet it did involve setting apart certain students for different treatment solely on account of their race. Although the effect on the student from this relatively minor and transitory discrimination might well have been minimal, especially when compared with the situations in more pervasive and enduring educational discrimination, our faithfulness to constitutional principles does not permit us to overlook it or to declare it a de minimis matter.

In requiring that African-American and Hispanic students sit in pairs, Ms. Zabel may have believed that she was acting in their best interest. Nevertheless, her action was based purely on the race of the student, and differences in treatment based on race in the classroom must be regarded as highly suspect. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224-27 (1995); see also Majeske v. City of Chicago, 218 F.3d 816, 819 (7th Cir. 2000), cert. denied, 121 S. Ct. 779 (2001). To survive strict scrutiny, a race-based classification must promote a compelling government interest. See Majeske, 218 F.3d at 820; Wittmer v. Peters, 87 F.3d 916, 918-19 (7th Cir. 1996). The state actor also must present evidence that the race-based classification is narrowly tailored to serve a compelling state interest. See Adarand, 515 U.S. at 227; City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493-94 (1989); United States v. Paradise, 480 U.S. 149, 167 (1987) (plurality opinion); see also DeWalt, 224 F.3d at 618. This "beady-eyed review," Chicago Firefighters Local 2 v. City of Chicago, 249 F.3d 649, 654 (7th Cir. 2001), is utilized because race-based classifications "threaten to stigmatize individuals by reason of their membership in a racial group and . . . incite racial hostility," Shaw v. Reno, 509 U.S. 630, 643 (1993).

It is well-settled that, under very

limited circumstances, a governmental entity may employ a racial classification. A governmental entity "has a compelling interest in remedying its previous discrimination and the agency may use racial preferencing to rectify that past conduct." Majeske, 218 F.3d at 820; see also McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir. 1998). Before employing such a remedy, however, the government must show evidence of past discrimination. See McNamara, 138 F.3d at 1222. When officials have violated the obligation to treat students without regard to race, "a court may require them to take race into account yet again to undo the racial identities." Samayoa, 807 F.2d at 647. School districts may undertake such a remedy on a voluntary basis to correct past discriminatory practices. See McDaniel v. Barresi, 402 U.S. 39, 41 (1971). Thus, the consideration of racial factors in undoing unconstitutional segregation is permissible. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 28 (1971); Banks v. Muncie Comm. Schs., 433 F.2d 292, 294 n.4 (7th Cir. 1970); United States v. Sch. Dist. 151 of Cook County, 404 F.2d 1125, 1135 (7th Cir. 1968).

This record provides no basis for justifying the racially based seating arrangement other than Ms. Zabel's reliance on a stereotypical notion that African-American students "view things in a global manner." No evidence of record indicates that this arrangement was implemented to rectify past discriminatory conduct that had left its effect on these students. On this record, without any justification other than Ms. Zabel's stereotypical notion as to how African-American children learn, her action cannot be justified, and, consequently, summary judgment is inappropriate. It may be that, in further proceedings, Ms. Zabel will be able to explain in a more satisfactory manner the reasons for her adoption of the racially based buddy system seating plan. Perhaps her decision was based on her professional assessment that, because of past discriminatory practices, students in this particular school had difficulty in adjusting to a racially diverse educational environment. However, we cannot accept as adequate her conclusory explanation. We must decide the case on

the record before us.

## C.  Qualified Immunity

An official entitled to qualified immunity is not only immune from personal liability but also from suit. See Saucier v. Katz, 121 S. Ct. 2151, 2156 (2001). Qualified immunity is available only to officials with discretionary or policy-making authority who are acting in their official capacities. See Jacobs v. City of Chicago, 215 F.3d 758, 766 (7th Cir. 2000). Such defendants are not subject to liability unless their actions violate clearly established statutory or constitutional rights then known to a reasonable officer. See Ulichny v. Merton Cmty. Sch. Dist., 249 F.3d 686, 706 (7th Cir. 2001).

The Supreme Court recently has reemphasized that entitlement to qualified immunity is determined by a two-step, sequential analysis. See Saucier, 121 S. Ct. at 2156; see also Denius v. Dunlap, 209 F.3d 944, 950 (7th Cir. 2000). First, we ask if the facts alleged show the state actor's conduct violated a constitutional right when viewed in the light most favorable to the party asserting the injury. See Saucier, 121 S. Ct. at 2156. If the facts alleged do not establish a constitutional violation, there is no need to proceed to the second step of the qualified immunity analysis. See id. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.

At this point in the litigation, our focus must be on whether Ms. Zabel can assert, on the record before us, qualified immunity. In the earlier section of our analysis, we determined that the present record would support a determination that Ms. Zabel's action in mandating that African-American children sit in pairs was violative of the Equal Protection Clause of the Fourteenth Amendment. We therefore shall proceed to the second step of the qualified immunity analysis. We must determine whether B.B.'s right to be treated equally in the classroom--specifically the right to be free from race-based seating arrangements--was clearly established

when Ms. Zabel implemented the seating arrangement.

In determining whether a right was clearly established at the time the defendant acted, "the right allegedlyviolated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Wilson v. Layne, 526 U.S. 603, 615 (1999) (emphasis added). The Supreme Court has stated that the "relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 121 S. Ct. at 2156. In undertaking this inquiry, the particular facts and the circumstances confronting the official must be considered. "It is not necessary for liability, however, that an identical factual situation had been legally decided adverse to the officer." Ulichny, 249 F.3d at 706; see also Finn v. New Mexico, 249 F.3d 1241, 1250 (10th Cir. 2001) ("[T]here need not be binding precedent on 'all fours' with the current case . . . we require some, but not identical, correspondence between the cases cited and the factual situation in the case at hand."); Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251 (2d Cir. 2001) ("[T]he absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established.").

Although the particular buddy system at issue here is, in all its particulars, perhaps unique to Ms. Zabel's classroom, it is, in essence, a form of race-based seating that has been condemned by the Supreme Court as long ago as its decision in McLaurin v. Oklahoma State Regents for Higher Education, 339 U.S. 637 (1950)./1

This initial condemnation of race-based seating in a school environment has been reinforced on numerous occasions, most notably in the decisions that we have discussed earlier in this opinion that make clear that state educators have the obligation to make student assignments in a race-neutral manner in the absence of a compelling government interest. Even then, such a remedial race-based distinction must be narrowly tailored to achieve that compelling government interest. Certainly, as a public school

educator, Ms. Zabel ought to have known of these well-established restrictions on the use of race as a criteria. Yet, the record contains not a hint that, in deciding to implement her buddy system, she was attempting to address the past effects of discrimination that may have required this sort of attention to the present needs of her students. Rather, the record affirmatively indicates that she relied on a stereotypical generalization about the way African-American children learn.

Accordingly, on this record, we cannot say that Ms. Zabel is entitled to qualified immunity. We do not preclude the possibility that, on a more developed record, she may be able to demonstrate, without contradicting her earlier deposition testimony, that it was reasonable to believe that the implementation of this seating plan was permissible. However, for purposes of disposing of the motion before us, we are bound by the record made by the parties in the district court, and, on that record, we cannot say that qualified immunity is warranted.

D.  School District Liability

A municipality may not be held vicariously liable, under sec. 1983, for the unconstitutional acts of its employees. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); Smith v. Metro. Sch. Dist., 128 F.3d 1014, 1027 (7th Cir. 1997). To establish that a municipality has violated an individual's civil rights under sec. 1983, the plaintiff must show one of the following: (1) that the city had an express policy that, when enforced, causes a constitutional deprivation; (2) that the city had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage within the force of law; or (3) that the plaintiff's constitutional injury was caused by a person with final policy-making authority. See McCormick v. City of Chicago, 230 F.3d 319, 324 (7th Cir. 2000).

Of these three possible bases for finding the school district liable, two clearly are not applicable. Regarding the

first option, it is undisputed that the school district does not have an express policy or practice of seating African-American or Hispanic children in pairs. On the contrary, both Ms. Zabel and her student teacher, Zentner, testified that it was Ms. Zabel's personal preference for each minority student to have a partner. Therefore, the school district cannot be found liable under the first option.

   With respect to the third option, it is uncontested that Ms. Zabel does not have final decision-making authority as a third-grade teacher. Although Ms. Zabel's job description was not provided in the record, elementary school teachers are uniformly required to instruct their students and conduct their classrooms in a manner consistent with school board policy. Consequently, Ms. Zabel is not a municipal policymaker.

   The final option under which the school district can be held liable also falls short. In assessing whether such a pervasive custom or policy exists, we have required the plaintiff to present facts showing that policymakers knew of the conduct or that the conduct was so widespread that they should have known. See Latuszkin v. City of Chicago, 250 F.3d 502, 505 (7th Cir. 2001); Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir. 1984) ("Actual or constructiveknowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.").

   The Billings are unable to show that Ms. Zabel's racial seating arrangement was sufficiently well-established to constitute a custom. The record will not support a determination that the race-based seating arrangement used by Ms. Zabel was so widespread and well-settled as to constitute a custom that fairly represents municipal policy. A classroom seating arrangement implemented by one third-grade teacher during the beginning of the 1999-2000 school year hardly can be considered widespread. Therefore, the Billings have failed to provide us with sufficient evidence to justify holding the school board liable because its members had either actual or constructive knowledge. As a result, the school

district cannot be held liable for Ms. Zabel's race-based seating arrangement.

Conclusion

We affirm the district court's grant of summary judgment with respect to the claim that the classroom assignment process was discriminatory. On this record, however, we must conclude that a grant of summary judgment for Ms. Zabel on the issue of her seating arrangement cannot be sustained. Furthermore, on this record, Ms. Zabel is not entitled to qualified immunity. Lastly, the school district cannot be held liable for Ms. Zabel's use of the seating arrangement. All defendants with the exception of Ms. Zabel may recover their costs in this court.

AFFIRMED in part, REVERSED and REMANDED in part

FOOTNOTE

/1 In McLaurin v. Oklahoma State Regents for Higher Education, 339 U.S. 637 (1950), the African-American plaintiff was a graduate student who claimed he had been denied equal educational opportunities because he was required to sit in special seats or at a special table designated for African-Americans. The Supreme Court noted that the special treatment McLaurin received because of his race set him apart from the other students. See id. at 641. As a result, the Court stated that McLaurin was "handicapped" in his pursuit of an education, and "his ability to study, to engage in discussions and exchange views with other students" was impaired. Id. Consequently, the Court held that the Fourteenth Amendment prohibited the state from treating students differently because of their race. See id. at 642. Based on this analysis, the Supreme Court then concluded that African-American students "must receive the same treatment at the hands of the state as students of other races." Id.